STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
JAMES W. CLEVELAND, DEFENDANT-APPELLANT.

Argued January 15, 1951—Decided February 5, 1951.

*Mr. Ervan F. Kushner* argued the cause for appellant (*Mr. Vincent E. Hull* and *Mr. Ervan F. Kushner,* attorneys).

*Mr. Donald G. Collester* argued the cause for respondent.

The opinion of the court was delivered by

WACHENFELD, J. The defendant was convicted of murder in the first degree and sentenced to death. He appeals, claiming error in the manner of the rendition of the verdict, refusal by the court to charge as requested, and the admission of an unsigned confession.

Frank Drewnoski, a bartender at a tavern located in Paterson, New Jersey, on the morning of February 25, 1950, was assaulted and his skull fractured by being struck a number of violent blows with an iron pipe. He died two hours thereafter.

The defendant lived and worked in the neighborhood and was a known patron at the tavern in question. The proprietor conducted a check cashing business for the convenience of his customers and the proof discloses Cleveland had availed himself of this service.

The evidence indicated the defendant, on the morning in question, boarded a bus in downtown Paterson, getting off a short distance from the deceased's tavern. He secured a heavy iron pipe about three feet long and secreted it under his clothing. He drank beer at the bar with several other patrons. One Barnes, who knew the defendant, spoke to him and suggested he could get his old job back at the Asbestos Fibre Company, where Barnes worked.

Cleveland made a telephone call and then entered into a conversation with other men in the tavern. They departed from time to time until, when one left to get a dog Cleveland had expressed an interest in purchasing, the defendant was the sole patron remaining in the tavern.

The State's theory was that the victim, Drewnoski, was seated behind the bar when struck on the head with the iron bar. He was not rendered unconscious but arose and, while attempting to make his way from the room, was struck again a number of times with the same instrument. He fell to the floor unconscious and bleeding.

Mrs. Murawski, the mother of the proprietor of the tavern, heard a commotion and came downstairs from the second floor. She found Cleveland behind the bar taking money from the drawer where it was kept and holding the iron pipe in his right hand. Drewnoski was lying motionless and silent on the floor behind the bar. When Cleveland saw Mrs. Murawski, he struck her several times on the head, fracturing her skull and jaw and rendering her unconscious, and fled.

He went to the home of Ruth Tucker, a friend, and exhibited the stolen money. Later on he went to a tavern across the street from her house and met an acquaintance, Willie Jackson, at whose apartment he stayed until about ten P. M. He discussed the murder with him and requested that Jackson secure for him a copy of a newspaper which, he had heard, carried the story of it. When he left Jackson's apartment, he took a bus to Newark and thence to Portsmouth, Virginia, his former home.

About two weeks after the murder he was apprehended at Deep Creek, Virginia, where the purported confession was taken under circumstances which will be narrated hereafter.

The crime was vicious and despicable and the evidence adduced points strongly to guilt. This does not, however, alter the applicable legal doctrines nor nullify or excuse errors committed in the trial. The right of an accused to a fair trial, with the customary safeguards accorded him by the Constitution and our law, is in no degree impaired or diminished by the strength or compelling character of the evidence against him.

A number of points in the appellant's brief were abandoned on the oral argument and will therefore not be considered. The reasons relied upon will be disposed of in the order of their presentation: first, the verdict of the jury was a nullity; second, there was error in the admission of the unsigned confession; third, error in the refusal to charge as requested.

The chronological sequence of events upon the jury's return, as shown by the record, is as follows:

"The Clerk: Ladies and gentlemen of the jury, have you agreed upon a verdict?

Jurors: Yes.

The Clerk: Mr. Foreman, how do you find?

The Foreman: We the jury find the defendant, James Cleveland, guilty of murder in the first degree.

Mr. Kushner: I respectfully request on behalf of the defendant that the jury be polled.

The Court: All right, poll the jury.

The Clerk: Hiller Geneslaw, how do you find?

The Foreman: Guilty.

The Clerk: Selvie U. Dulow, how do you find?

Juror No. 2: Guilty.

The Clerk: Lina A. Burke, how do you find?

Juror No. 3: Guilty.

The Clerk: Edward T. Sturm, how do you find?

Juror No. 4: Guilty.

The Clerk: Elwain P. Hitchcock, how do you find?

Juror No. 5: Guilty.

The Clerk: Edward H. Heintjes, how do you find?

Juror No. 6: Guilty.

The Clerk: Ethel F. Baynes, how do you find?

Juror No. 7: Guilty.

The Clerk: Irving Jacobus Grieves, how do you find?

Juror No. 8: Guilty.

The Clerk: Eleanor Horka, how do you find?

Juror No. 9: Guilty.

The Clerk: William H. Brophy, how do you find?

Juror No. 10: Guilty.

The Clerk: Dorothy M. Struyk, how do you find?

Juror No. 11: Guilty.

The Clerk: Thomas Schiffanella, how do you find?

Juror No. 12: Guilty.

The Clerk: Ladies and Gentlemen of the jury, hear your verdict recorded: You say you find the defendant guilty of murder in the first degree, as rendered by your Foreman, and so say you all.

The Court: Ladies and gentlemen of the jury, I thank you for your services in this case. You have done your duty faithfully and well. You are now discharged.

(The jury left the court-room.)"

Immediately thereafter the defendant was sentenced to death.

The statute controlling is R. S. 2:138–2:

"* * * and the jury before whom any person indicted for murder shall be tried shall, if they find such person guilty thereof, designate by their verdict whether it be murder in the first degree or in the second degree."

*Rule* 2:7-9(a) provides the verdict shall be unanimous and shall be returned by the jury to the judge in open court, while section (d) of the same rule reads:

"When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If, upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged."

 The polling of the jury is a procedure whereby. the jurors are asked individually the finding they have arrived at, as denoted by the question posed by the clerk: "* * * how do you find?" The practice of long standing requires each juror to answer for himself, thus creating individual responsibility, eliminating any uncertainty as to the verdict as announced by the foreman.

 If the jury returns a verdict of guilty without designating the degree of murder of which the defendant is guilty, as required by the statute, the verdict is fatally defective and no judgment can be legally pronounced thereon. *State v. Turco,* 98 *N. J. L.* 61 (*Sup. Ct.* 1922).

In *State v. Cooper,* 2 *N. J.* 540 (1949), discussing the requirements of the statute in this respect, we held:

"First, the statute is imperative in its command that, if the accused be found guilty, the jury shall determine whether the offense be murder in the first degree or in the second degree; and secondly, we have no way of knowing from the verdict as rendered whether the issue of degree was even considered by the jury, much less determined. The accused is subject to the extreme penalty only in case there shall be a conviction of murder in the first degree in specific terms, unattended by a recommendation of life imprisonment; and the infliction of the death penalty upon a mere verdict of 'guilty' is wholly nugatory."

True, here the foreman of the jury, when first inquired of, said: "We the jury find the defendant, James Cleveland, guilty of murder in the first degree." Likewise the clerk recited the stated formula after the jury was polled. Admittedly, however, when individual answers were given, each juror, including the foreman, replied "Guilty" but did not

specify the degree of murder which the defendant was. guilty of.

The State argues thusly:

"There was no dissent by any member of the jury at any time, nor did the defendant's counsel, even though it was not legally essential, make any objection or protest."

 We know of no authority creating an inference because a juryman fails to dissent, nor are we cognizant of any practice which makes his failure to dissent or mere silence the equivalent of a full finding as proclaimed by the statute.

 We see little merit in the State's intimation that "it was clear what verdict the jury intended to render and no other inference could be drawn than that the defendant was guilty of. murder in the first degree as prescribed by the statute."

In *State v. Cooper, supra,* we determined:

"A finding of circumstances constituting murder of the first degree is not to be annexed to a verdict of 'guilty' by intendment or a presumption based upon the evidence. That is a solemn obligation of the jury in a matter of the utmost gravity; and its fulfillment cannot be made to rest on bare inference. The death sentence cannot be pronounced unless the verdict is definitive of the degree of guilt which entails that penalty. Not only is it understandable that the Legislature deemed it essential that in resolving an issue. involving the death penalty. or life imprisonment, the finding be specific and not left to conjecture; it is inconceivable that it would not have so provided."

As to the suggestion that relief be withheld because counsel "sat by and allowed the court to impose a sentence of death upon the defendant without the slightest indication of protest," this seems to have been pointedly disposed of in *State v. Cooper, supra:*

"* * * the failure of the accused, at the time of sentence, to question the sufficiency of the verdict, by motion in arrest of judgment or otherwise, did not serve to confer upon the judge jurisdiction to impose the extreme penalty as for murder in the first degree."

In *Williams v. State,* 60 *Md.* 402 *(Ct. of App.* 1883), there appeared the same factual situation. The jury, by their fore-

man, declared the defendant guilty of murder in the first degree. Before the verdict was recorded, a poll of the jury was demanded and each juror responded "Guilty" without specifying the degree of murder. On conclusion of the poll, the clerk of the court called upon them to hearken to the verdict as the court had recorded it, saying: "Your foreman saith that Jason Williams, the prisoner at the bar, is guilty of murder in the first degree, and so say you all." The sufficiency of this finding was the sole issue on appeal, which resulted in a reversal of the judgment of conviction and the awarding of a new trial. The Court of Appeals said:

"The prisoner was entitled, as a matter of right, to a poll of the jury, and he could not be convicted, except upon the concurrence of each juror. Upon the poll, it was the duty of each juror to say for himself, whether he found the prisoner guilty of murder in the first or second degree. We all know that jurors sometimes, upon the poll, dissent from the verdict declared for them by their foreman, and it is for the purposes of compelling each juror to declare his own verdict, in his own language, that a poll of the panel is allowed. Upon the poll in this case, there was not a single juror who, in finding the prisoner guilty, ascertained the degree of murder as required by the Code. On the contrary, the verdict was 'guilty,' and such a verdict is, as we have said, on an indictment for murder, a nullity."

A similar development occurred in *Commonwealth v. Schmous,* 162 *Pa. St.* 326, 29 *A.* 644 (*Sup. Ct.* 1894). The request to poll the jury, however, was not made until after the verdict had been recorded. The individual jurors had declared they found the defendant "guilty" without specifying the degree of murder, but the court upheld the verdict, saying:

"According to the well-settled practice in the Oyer and Terminer, the request to poll the jury came too late, and should have been denied. The verdict, in due form, had already been not only announced, but recorded, and affirmatively responded to by the entire jury."

The question involves more than a technical violation of a statute or rule of procedure. It is a matter "of utmost gravity" as it adjudicates not alone the guilt of the defendant

but carries with it the punishment of death. Such a determination cannot be left to inference. The finding must be specific and in exact accord with the statutory mandate.

We think the law clearly demands that when a jury in a murder case is polled, each juror, if he finds the defendant guilty, shall designate by his verdict whether it be murder in the first degree or in the second degree.

This was not done in the case under consideration and we think it constituted prejudicial and therefore reversible error.

As to the admission of the confession in evidence, it appears the defendant was apprehended on March 10, 1950, in Virginia for the murder committed in New Jersey. Upon notification of his arrest, an assistant prosecutor of Passaic County, chief of the county detectives and a Paterson police detective flew to Virginia to interrogate the defendant and arrange for his extradition.

On the following morning, the defendant was taken to the clerk of the Trial Justice Court for the County of Norfolk, Virginia. Cleveland was informed that a warrant had been issued for his arrest on the charge of murder and signed a waiver of extradition. Following these extradition proceedings, the defendant was interrogated in a conference room at the Norfolk County Jail by the assistant prosecutor in the presence of the chief of the county detectives, the Paterson detective, the sheriff of Norfolk County and an officer of the Norfolk County police. The inquiry started in the morning and after lunch extended into the afternoon. A court stenographer of forty years' experience was called in and took stenographically the questions asked the defendant and the answers given by him.

After Cleveland had been returned to New Jersey, the reporter in Virginia transcribed his shorthand notes into a typed statement in question and answer form. This statement was never signed by the defendant nor read to him, nor was he ever shown it or given an opportunity to read it at any time prior to trial. It was admitted in evidence over the defendant's objection and marked S-51.

The defendant testified the statement was made under duress in that the police officials threatened to beat him if he did not talk. This was refuted by the officers who were present at the time as well as by the court stenographer. Their version is quite to the contrary. They say the defendant wanted to get the matter off his chest; that he testified freely and voluntarily, without any threats or promise of reward being made.

▮ The mere assertion by an accused that a statement taken from him is involuntary is not sufficient to render it inadmissible where there is direct evidence to the contrary.

The court here admitted the confession but charged the jury that the evidence was conflicting; that the weight to be given to the confession was a matter for them to decide; and if they found, as a matter of fact, that the confession had been involuntary, they were not to consider it.

▮▮ The trial court in this respect was on firm ground, well fortified by the cases holding that whether a statement or confession is voluntary depends on the facts of each case. Its competency is primarily for the trial judge and the weight to be given it is determined by the jury. *State v. Compo,* 108 *N. J. L.* 499 (*E. & A.* 1932); *State v. Pierce,* 4 *N. J.* 252 (1950).

▮ The confession, we think, was voluntary.

The defendant's further contention that the confession was inadmissible because it was unsigned and unacknowledged and therefore merely a memorandum raises a more troublesome issue. The question is squarely raised as to whether or not a voluntary statement made under the circumstances here described, which is not shown or read to the accused nor signed or acknowledged by him, is admissible in evidence in a criminal trial.

The State seeks shelter in *State v. Lustberg,* 11 *N. J. Misc.* 51 (*Sup. Ct.* 1933); *State v. Donato,* 106 *N. J. L.* 397 (*E. & A.* 1930); and *State v. Foulds,* 127 *N. J. L.* 336 (*E. & A.* 1941), while the defendant cites *State v. Dietz,* 5 *N. J. Super.* 222 (*App. Div.* 1949).

*State v. Lustberg, supra,* was an indictment for a conspiracy to defraud by making a false claim arising out of a pretended automobile accident. The statements involved were those of six defendants, all of whom were interrogated by the police in the presence of some other defendants, in each instance Lustberg being present throughout the interrogation. It was conceded the transcription was accurate and two of the defendants signed the statements. In a *per, curiam* opinion the court held there was no prejudicial error in the admission of the statements in evidence, relying upon *State v. Donato, supra,* but it is noteworthy that the accuracy of the transcription was not disputed and two of the defendants had actually signed the statements.

In *State v. Donato, supra,* the Court of Errors and Appeals was sharply divided, nine to six. There four defendants were indicted and tried for murder. They made statements which were reduced to writing by the police. Two of the defendants signed them. Donato and O'Keefe, after the statements had been written out in question and answer form, refused to sign them when presented for that purpose. There was no suggestion that they were inaccurate in the slightest respect.

Under these circumstances, the court held there was no error prejudicial to the defendants in their admission in evidence, citing 2 *Whart. Cr. Ev.* 1329: "It is not necessary to the admissibility of a written confession * * * that it should be signed by the accused."

But it limited and qualified its ruling by declaring:

"We do not go so far as to adopt that as an unqualified rule. But the undoubted rule is that a confession of the accused which was reduced to writing by another person and was read over to or by the accused, and which was signed or otherwise admitted by him to be correct, is as much his written confession as one prepared entirely by his own hand would be; and when made voluntarily it is admissible against him. 16 *C. J.* 732."

A condition specifically required is that the statement must be "read over to or by the accused" and, conjunctively, that it be "signed or otherwise admitted by him to be correct."

It is not even urged that these conditions were complied with in the present case. After the defendant was interrogated in the presence of a stenographer, he was bundled back to New Jersey and the stenographic notes were not transcribed until long after his departure from Virginia. The defendant never saw or read the .statement then prepared nor did he sign it or otherwise admit its correctness.

The query arose in *State v. Foulds, supra.* There it was contended that because the signed confession was made before the victim died, it could not be used at the defendant's trial for murder. Shortly before making the confession, the prisoner was taken to the hospital and brought into the presence of Mr. Cominsky, the victim, who at the time was receiving a blood transfusion. The defendant then and there admitted his act and said he was sorry for what he had done. Later he made and signed the confession.

The following day, Cominsky having died in the interim, Foulds was told of his death and informed he was to be questioned again and that the charge against him was murder. He did not repudiate his former statement. He was advised he might answer questions or not, as he saw fit, but whatever he did say "must be a voluntary statement which will be taken down in writing and used at your trial." Asked, "Do you understand that?" he answered in the affirmative and proceeded to make the following statement:

"Q. In view of the charge of murder against you, do you wish to make a further statement? A. I want to say that I killed that man. It is my fault, I want to get what is coming to me, to be sent to the electric chair and get what is coming to me. I tell you now I don't want any hard feelings. I gave you all the information I could last night. I tell you right now that I am not going to sign any paper.
Q. Is there any correction or addition you wish to make to the statement you made last night? A. No, sir."

The court said:

"The signed confession was voluntarily made. There was no deception used in obtaining it. The statement which the defendant refused to sign, when informed that Mr. Cominsky had died, corroborated the first confession."

It is obvious from the brief history here given that the defendant was merely re-affirming a written statement he had already signed and admitted was correct.

The question was again encountered in *State v. Dietz, supra.* There, over the defendant's objection, the trial court admitted in evidence a copy of the defendant's unsigned statement, comprising interrogations and answers made at the Ramsey Police Barracks, at the end of which this notation was contained: "At this time subject had convulsion or fit of some kind and lost consciousness."

Error was assigned in admitting the alleged statement on the ground, amongst other things, that it was not signed, relying upon *State v. Donato, supra,* the court observing:

"It is obvious from the testimony of the police officer that the statement was not signed by the defendant, nor was it read over to or by him. In addition, so far as revealed by the record, the first time that the statement was read in the presence of defendant was at his trial, when he denied that part dealing with his being sexually maladjusted."

The court concluded:

"Under authority of *State v. Donato, supra,* it was error for the court to admit the statement as a confession."

We think the rule is clearly spelled out in these cases that until the statement is signed or its correctness acknowledged in some fashion by the defendant, it constitutes merely a memorandum of what was said and is inadmissible in evidence. In such cases, the State is limited to the oral testimony of witnesses who were present when the statement was made. They may, for the purpose of refreshing their recollections, where necessary, refer to notes made at the time by them, or under their supervision.

While the argument for admitting stenographic transcripts as the best evidence has received some support, the contrary rule is nevertheless quite firmly established by many decisions.

"* * * the stenographic transcript is not primary evidence, nor, indeed, any evidence at all." *State v. Rose,* 3 *N. J. Misc.* 1002 (*Sup. Ct.* 1925).

In *Jenkins v. State,* 35 *Fla.* 737, 18 *So.* 182 (*Sup. Ct.* 1895), a murder trial, the defendant had made certain oral statements which were reduced to writing by the state's attorney and received in evidence at the trial. It was not signed. In reversing the conviction, the Supreme Court said:

"Such statement could have been used, if necessary, for refreshing the recollection, but for no other purpose."

In *Wells v. U. S.,* 257 *Fed.* 605 (*C. C. A. 9th,* 1919), an interview with the defendants was transcribed by the stenographer, who testified as to what was said. After the defendants testified to the contrary, he was recalled in rebuttal and the transcript of the notes put in evidence over objection. In disposing of the issue so raised, the court said:

"Technically the transcript should not have gone in, because the notes of the interview could be used by Greene only for one purpose, namely, that of refreshing his memory in case he was unable to testify from his independent recollection, and not as substantive testimony of what was said there."

In *State v. Strain,* 84 *Ohio App.* 229, 82 *N. E.* 2d 109 (*Ct. of App.* 1948), the accused, after he was captured by police officers, was questioned and his statement taken down in shorthand and later transcribed. In disposing of a motion in reference to the statement so secured, the court said:

"The transcript in question is not a written confession signed by the defendant and is therefore not competent as evidence."

In *State v. Meharg,* 196 *La.* 748, 200 *So.* 25 (*Sup. Ct.* 1941), voluntary statements were taken by the sheriff after arrest and before trial. They were in the form of questions and answers and were taken in shorthand by a stenographer and later transcribed but never shown to the defendants. They were offered in evidence but objected to and the objection sustained.

So, too, in *Commonwealth v. Simpson,* 300 *Mass.* 45, 13
*N. E.* 2d 939 (*Sup. Jud. Ct.* 1938), a dying declaration of
a victim was testified to by a witness. It was written down
by a police captain. On appeal, the court noted with approval,
"The writing was not admitted in evidence."

The pith of these decisions quite firmly establishes
the thought that, where the transcribed statement is not read
by or to the accused and he does not sign it or otherwise
acknowledge its correctness, the oral testimony of witnesses,
and not the transcript, is the only admissible evidence of the
purported confession, and we are not willing, in the case *sub
judice,* where the death penalty is one of the issues to be
decided by the jury, to depart from what we consider the well
entrenched and justified rule.

The admission of the writing being error, we have little
difficulty in concluding it was also prejudicial. True, on a
retrial the stenographer might testify to substantially every-
thing contained in the written statement, but we are inclined
to the view that the writing shears the balance of the oral
testimony in the case of the weight it would otherwise have
and is erroneous because:

> "A thing in writing carries, particularly with the layman, a weight
> of its own. When the jury withdrew they took with them their
> recollection of the defendant's testimony and their recollection of
> Jacobson's testimony and, in addition, this exhibit, which not only
> was a thing in writing but because of that fact was a present and
> constant reminder to the jury of its contents. It may have been
> the fulcrum upon which the verdict turned." *Springer v. Labow,*
> 108 *N. J. L.* 68 (*Sup. Ct.* 1931).

The admission of S-51 was improper and prejudicial.

Lastly, error is claimed in the refusal of the court to charge
the defendant's request No. 8:

> "If there is in the mind of the jury one or any number of theories
> consistent with the defendant's guilt, fairly springing from the evi-
> dence in the case, which the jury believe, and but one theory consis-
> tent with the defendant's innocence, fairly arising from the evidence
> in the case, including the defendant's testimony, which the jury also
> believe, the jury must disregard and put aside all those theories of

his guilt, and adopt that one theory of his innocence, and render a verdict of not guilty. For, in such condition of the case there would be a reasonable doubt of the defendant's guilt and the defendant should be acquitted."

The court refused to charge as requested, stating the matter had already been covered in the general charge. This we find from an examination of the record to be so. The court need not charge in the exact language requested if the subject matter of the request has been fully covered in the general charge. The defendant has no right to choose the language in which the court shall state to the jury the pertinent instructions requested. *State v. Tansimore*, 3 *N. J.* 516 (1950); *State v. Bunk*, 4 *N. J.* 461 (1950); *State v. DePaola*, 5 *N. J.* 1 (1950). We see no error in this respect.

The judgment of conviction is reversed for the reasons herein stated and a trial *de novo* ordered.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For affirmance*—None.